Good morning, Your Honors. May it please the Court. Kristen Reyna DeHart, on behalf of Defendants, Appellants, San Diego Family Housing, and Lincoln Military Property Management, I'll be referring to them today during the argument as SDFH and LMPM as we did in our papers. I'd like to reserve two minutes for rebuttal. By way of a brief background, Your Honors, this case has been in federal court for the past four years, including an interlocutory appeal before this Court in 2021, in which not only the Childs were involved but also United States' amicus. However, it was not until the fall of 2023 that the United States interjected itself into our motion for summary judgment briefing to, for the first time, raise jurisdictional issues with our basis for being in federal court in the first place, both federal enclave jurisdiction and federal officer jurisdiction. I don't think that I misstate that the centerpiece of this appeal, and likely this argument today, is federal officer jurisdiction. And specifically, whether this Court's decision in 2022 in Lake View Ohana Military Communities requires that SDFH and LMPM cannot avail themselves of federal officer jurisdiction because they are the mirror image of Defendant Ohana in the Lake case, as the United States and the Childs contend, or that this case presents an entirely different factual and evidentiary circumstance such that a different result is required as SDFH and LMPM contend. In the Lake case, this Court was presented with only a few factors in support of the federal officer removal statute. Three of them were extremely general and not specific to the claims in the case which related to pesticide contamination and claims by the plaintiffs that they were exposed to pesticides. The three general factors were that the Navy provided a basic housing allowance to service members, that the Navy could control who occupied the housing, and that they had some control over budgeting and management. Mr. Hart, just to cut to the chase, Lake says, the import of Lake to me, is whether the allegations are about whether the Navy directed defendants' challenged actions. And here it's about mold, inspection, testing, and abatement. I am struggling to see what in the record indicates some measure of control or direction on the mold abatement and testing side that would be enough for a federal officer removal. Can you tell me where in the record I should look to? Absolutely, Your Honor. First, I'll point you to the O&M plan, what we call the O&M plan. This is also referred to in the ground lease as the mold management plan. These are the ground leases, and the O&M plan are in our sealed volumes, volumes 9 and 10. The mold plan is specifically at 10 ER 1726 through 1736. This was a plan that was directed by the Navy to SDFH to prepare to be what SDFH would follow in responding to mold and water intrusion. And I looked at that mold plan, and I guess what I'm missing from it is what in the mold plan restricted defendants' ability to do further testing or abatement consistent with what plaintiffs wanted to have happen. The mold O&M plan specifies a certain number of inspections to take place and the timing of those inspections. It also specifies how remediation is to take place and contractors to use. We followed that plan in responding to the child's complaints. The child's claims in this case are not that we didn't follow the plan, but we should have done additional inspections. Right, but I don't see that the plan directs that you couldn't do those additional inspections. It provides some general policies, but it doesn't seem to supply the kind of control that you're claiming it does. Go ahead. Maybe I'm misunderstanding it. Well, the plan is based on the Navy's housing policies, and so it specifies a certain number of inspections and a certain type of response to mold and water intrusion events in the Navy housing. SDFH and LNPM contend, as their theory of the case, that they followed those criteria. And this is actually kind of a candidate. So where in the record does it say that it specifies that there must be a certain number of inspections? I mean, is there something in the plan that says you may only inspect two or three times? It doesn't place a limit like that, but it does have a criteria for inspections after a certain amount of time that the first inspection has to take place within a certain amount of time. Then another inspection needs to take place, and then a follow-up inspection within a certain number of days. So that is laid out within the plan. Assuming that the 1940 statute, this 40 U.S.C. section, I think it's 3112, applies to the Sabram property, do you concede that you've cited to no evidence that the United States has accepted jurisdiction over the lands by filing a notice with California? This is switching over to the federal enclave, Your Honor. I do concede that there is no evidence of acceptance, but it's our position that based on the definition of the term acquired in that statute, that that doesn't apply to the land. But isn't it dispositive if they never assented? No, Your Honor, because... Why wouldn't that just take out the whole federal enclave point? Well, no, Your Honor, because it's our position that that statute was not triggered because acceptance is only required when the property is acquired. The statute actually uses the term acquired, and the term acquired is defined within the statute to only include purchases, trades, exchange. It doesn't address the specific circumstance of made land, which we argue under USFEB Corporation applies to this parcel F on which the Saipan property sits. So our argument is that you don't even get to that statute because there was no acquisition of the land. So if there was no acquisition, then there was no requirement for acceptance of jurisdiction. So if the federal government made the land, what do you rely on for the notion that it's necessarily exclusive jurisdiction? Yes, Your Honor. So if under USFEB... Is that the 11th Circuit case? It's the 11th Circuit case. But that talked about, wasn't that about the Submerged Lands Act? It actually predated, I believe, the Submerged Lands Act, and that's just the precursor. That states that if land is made for the United States' use, that then the United States owns the land. There's another statute that was in place... Just to stick with that one, because the FEB case only talks about title or ownership to land. It says nothing about jurisdiction or, indeed, exclusive jurisdiction. That's right. And so a lot of what's happening in these cases in the 1940 Act and everything else is concurrent jurisdiction, concurrent legislative jurisdiction. That's why we're so focused on whether the U.S. assented to any type of jurisdiction. And I don't see anywhere in your papers where there would not need to be some assent to exclusive jurisdiction here. Under the same statute, Your Honor, if the land was made for military use, then exclusive jurisdiction is confirmed as long as there was a plat map on file from the county that demonstrates by meets and bounds the property that's at issue. The acquired portion of the statute is separate, and we cut that out because we believe that since the land was made, that that portion of the statute doesn't apply because the land was made for military use. Your arguments about acquisition appear to rely on a 1998 statute that defined acquired in a completely different context related to timbering. You think that still applies here in this context? I think because it's under the same United States Code, yes, I do. And I think that that's the first place where you would go to define the term acquired under this context, is the same U.S. Code provisions. Why do you feel so strongly about litigating this case in federal court instead of the local court? Well, Your Honor, we do believe that there is a clear causal nexus between the actions that SDFH and LNPM took with respect to the child's housing and the child's claims in this case. We did talk about the OMB. I'm just curious. The appeal alone has probably cost your client a lot of money, and if you have the federal government going to all the trouble to get involved here to emphasize that it never ascended to enclave jurisdiction over the Saipan property and your other arguments, I'm just trying to figure out why you're not going to state court. What's the real motivation here? Well, Your Honor, I do think that these claims that relate to federal actions, actions under a federal superior and plans and policies under a federal superior, should be heard by a federal court. We also do bring a defense of derivative sovereign immunity, a defense that even the United States has said multiple times is a colorable federal defense, that we acted under the federal superior at the direction of the federal superior, and those actions are put at issue by the child in this case. It seems, though, that all of the ground leases, military bulletins, the letters you point to show general regulations surrounding military housing, and it seems like you need evidence to present that it shows specific military orders directing your client's exact response to the plaintiff's complaints here, sufficient to have that causal nexus control prong of the federal officer removal statute, and it just seems like it's a bit of a stretch for this, what appears to be a landlord-tenant dispute. Well, it's a landlord-tenant dispute that involves the United States Navy, and the directions that the Navy have given SDFH and LNPM under operating agreements, the ground lease, the O&M plan, we haven't discussed the Navy's mold policy or the relocation policy, which the child's put squarely at issue in their complaint by claiming that we didn't test for mold. Our response is we followed the Navy's mold testing policy by not testing for mold. Right, but I guess I'm sorry. I was just saying it seems like they contracted, the Navy contracted that out, you know, and now, and then the contractor, I guess your client, was going about that business, but I don't know that they had that heavy of a hand on these specific aspects, and that's why I'm struggling to see why we would say this goes under federal jurisdiction. I'd like to point your honor to the Declaration of Mr. Rizzo, which I think does lay out in quite a bit of detail the ongoing supervision that the Navy has over SDFH and LNPM. He discusses all of the contracts and the plans, but he also discusses how NAVFAC and its business asset manager routinely monitors SDFH and LNPM's compliance with these different regulations and policies. They have meetings weekly, biweekly, monthly. They electronically monitor how they respond to mold and water intrusion. Can I ask, though, you know, this is a public-private partnership, and the managing member is a private entity called Lincoln Clark, right? And the operating agreement says that Lincoln Clark has exclusive management and control of SDFH and full authority to take all actions necessary or appropriate, and the same thing happened in Lake. And I guess my question is can there be federal officer removal when you have a provision like that in an operating agreement that bestows this exclusive authority to a private party? My response is that it's not exclusive. That snippet, that part of it is not exclusive. I mean, it says it has exclusive management and control of SDFH. But the first part of that sentence, your honor, it says except as otherwise discussed in this agreement, and there's an entire section in the operating agreement, Section 5.12, that discusses the duties of the United States member and the United States member's duties are also discussed in other locations throughout the operating agreement. And you do have the testimony of Mr. Rizzo, which has not been contradicted by any evidence put forth by the United States. They haven't submitted any of their own evidence to contradict any of these documents. They haven't submitted a declaration from the Navy saying that Mr. Rizzo is incorrect or that the Navy doesn't have the control and supervision and the checking and the oversight that it has that we have described in our papers. Judge Thomas, did you have a question? No. Okay, thank you. Do you want to reserve the balance? Yes, your honor. Okay, thank you. Good morning, your honors, and may it please the court. My name is Christian Clark. On behalf of the Apelles, Lena Childs, and the Childs family, as outlined in Apelles' brief and in the amicus brief followed by the United States, Apelles' position is simply that the district court's ruling was well-reasoned and that this case essentially is not sufficiently distinguishable from the late case that this court should come to any other conclusion than what occurred in the late case. Counsel, can you start with the last point that we were dealing with where counsel argued that the U.S. has reserved certain powers back in the operating agreement that are otherwise exclusive to the managing partner? Yes, your honor, and that is specifically addressed in Apelles' brief. The reference is to Section 5.12, which describes the member duties of the government partner of the public-private venture. But notably, none of those duties have any relevance to how to deal with tenant complaints related to mold or tenant complaints in general. So, overall, I would suggest that, yes, perhaps the government partner does have certain duties under the plan and the operating agreement, but they wouldn't be relevant to the instant case. How about can you address counsel's comments regarding the Rizzo testimony that that's not disputed and they've put in sufficient evidence through the Rizzo declaration? Certainly, your honor. So the Rizzo declaration describes with a level of specificity and detail the kind of, and I'll quote some of the terms used that appellant's counsel cited, supervision, oversight, and review that the United States has, or I should say the Navy has with respect to the actions taken by the public-private venture and specifically the managing partner, which is the private portion of that company. But importantly, as stated in the late case and outlined in, excuse me one moment, the Fidelidad Inc. v. Institute Inc. case, which was quoting the Watson case, that's on page 1004 of the late case, removal is not allowable simply because the federal officer directs, supervises, and monitors a company's activities in considerable detail. And what I would contend, your honors, is simply that that declaration, yes it does go into considerable detail, but it's not the type of direction or specific directive as it relates to plaintiff's complaints that would be required to establish a causal nexus. Instead, it's simply a description in considerable detail of the oversight, which was found to not be enough. Well, but doesn't the Rizzo Declaration goes beyond things that are just oversighted? You know, Rizzo says the timing of inspections is controlled, the directions for responding to complaints, servicing directions, et cetera, tracking requests. Why is that not enough? Yes, your honor. So for one, I would say, as your honors pointed out earlier, there's no limiting factor contained in any of the documentation as it relates to the duties of the private partner and the managing partner. In fact, as your honors pointed out, the operating agreement and indeed as outlined in the appellee's brief, all of the documentation that was submitted in support, which includes the operating agreement, property management agreement, to which the Navy is not a party, the ground lease, the O&M plan itself, the letter directives, all of those documents repeatedly disclaim the United States' responsibility and repeatedly emphasize the private partner's responsibility when it comes to specifically addressing tenant concerns and gives them broad authorization and authority to do whatever is needed. So yes, there may be some guidelines and there may be some level of specific information concerning how oversight will occur, whether that's in the context of meetings, for example, but that's not limiting the private partner from complying with, for example, state tenability laws and landlord-tenant laws generally. Now, your honors, I would also like to specifically address why we believe that the Lake case is so particularly similar to this case and why, at least with respect to the issues of federal agency jurisdiction and removal under the federal officer statute, we would contend that the same decision and holding should apply here. Specifically, the Lake case involves similarly a public-private venture that similarly has a managing member and a government member and similarly involves a management plan, in that case the pesticide management plan, in this case the O&M plan or the mold management plan, that relates to the managing member's responsibilities and duties as it relates to dealing with those kinds of issues. And in the Lake case, the court opined that the PPV did not, or excuse me, the court opined that the broad authority and discretion afforded to the managing member of the PPV was sufficient to lead to a finding that there was not a causal nexus in that case. And the same thing is true here. I mean, nearly the exact same language is utilized in the context of the operating agreement, in this case as the language that was utilized in the Lake case. Specifically, in Lake, the language utilized was that the private partner or the managing partner had sole and exclusive management and control, and in this case, the language utilized is full authority or in other sections it states the right power and authority to take whatever actions are necessary to carry out the duties of the company, which obviously would involve leasing property and managing issues. And I would also contend that with respect to the Lake case specifically, in that case, the public-private venture similarly argued that the pesticide management plan was reviewed and had to be looked at by the government partner before it could be acted upon, and essentially the exact same thing occurs here with respect to the O&M plan. Your time is up. Thank you, Your Honor. Thank you. Good morning, Your Honor. May it please the Court, Daniel Winnick for the United States as amicus. Subject, of course, to the Court's questions, I'd like to focus on whether the housing facility here falls within an enclave of exclusive federal jurisdiction. As our brief explains, courts in the circuit have not always been clear on issues of exclusive federal jurisdiction. We think it's useful if the Court explains clearly that the creation of exclusive federal jurisdiction within a state requires deliberate action by the federal government. That's always been true in two of the three scenarios in which exclusive jurisdiction can be created. First, the one discussed in the Constitution, where the government buys land with the state's consent for the erection of certain types of buildings, and second, where Congress conditions the admission of a new state to the Union on the cession of jurisdiction, and it's been true since 1940 by statute. In the third and most common scenario, where a state legislature cedes jurisdiction over some of the state's land. What was in counsel here, when I asked the question about the assent, it pointed and redirected me to the acquired, whether it was properly acquired, and if it was never properly acquired, then there's no assent. Can you respond to that? Sure. So I think their argument is that the 1940 statute doesn't even apply because they think the United States doesn't acquire land when it comes to own the land by building it up from the seafloor. There's just not a basis for that argument. The plain textual meaning of the word acquire, both in 1940 and today, is to gain possession or control of something, or to get it or obtain it by any means. The United States clearly gains possession of land if it creates the land by building it up from the seafloor. But there's a weird wrinkle to this, and that is if the 1940 Act applies to land that's also been built up, created by the federal government, who would the U.S. give assent to? Because normally it would be to a state or the governor or through some means to some other party saying, you've given us jurisdiction and now we're accepting it. But if it's created land, how does the U.S. government assent to exclusive jurisdiction there? So there's still a session of jurisdiction in that scenario. Their theory is it was ceded under this 1897 statute. We think that theory is wrong for a number of other reasons, but if you set those to the side for a minute and assume the 1897 statute did cede jurisdiction, that would be a session by California, and so the United States would provide its assent to California, as Your Honor noted earlier. They rely on FEB only for the proposition that the government owned the land that it created from the seafloor. I don't take them to be making an argument anymore that any land that the United States. But, I mean, I agree with you. I don't think it's land that was ceded from California if the theory is that the federal government made it itself in the 1940s. So in that circumstance, I don't see any sort of clear answer as to what type of jurisdiction would apply or how the U.S. government would assent to that sort of jurisdiction in that circumstance. Well, we may be talking past each other. I think we agree that the United States came to own the land by creating it from the seafloor. We agree with defendants that the way in which one could understand the government to have acquired jurisdiction over that land, the federal government, is because it was ceded through this California statute. And so if that's their theory, then the way you would accept that session of jurisdiction is by writing to California and saying, Thank you, we accept the jurisdiction. And as they conceded this morning, and they haven't disputed in their briefs, there's just no evidence that any acceptance of that jurisdiction ever happened. Their only argument is that the United States does not acquire land when it builds it up from the seafloor. And their only rationale for that argument is that they invoke this definition of acquire in Title 16, 16 U.S.C. 620E. But that definition by its very terms applies only, quote, for the purposes of 16 U.S.C. 620 or 620 to 620J, which, as Chief Judge Murguia noted, is about timber. And so they say, Well, it's the same statute because it's the U.S. Code. But obviously there's a lot of things in the U.S. Code. There's probably other definitions of acquire in the U.S. Code. And the fact that Congress has a term of our definition in Title 16 says nothing about what should be the relevant definition here. The alternative theory, it seems, of the SIPAP property coming under control of the federal government was through a 1955 civil condemnation proceeding. Under that theory, would the 1940 statute apply? It seems like it would. Yes, so that's an alternative in the sense that it's our factual theory of how we came to own the land. The district court didn't resolve the factual dispute as to how we came to own the land, and this court both needn't and can't. But, yes, if that is the factual way in which we came to acquire the land, then I actually don't take them to dispute that there's no exclusive federal jurisdiction for that reason, among others. It would never have been ceded from California in the first place if we came to own the land in that way, and we wouldn't have accepted it. So their theory is entirely that we came to own the land by creating it from the seafloor in the 1940s, that there was a session of jurisdiction under this 1897 California statute, and that we didn't have to accept it because we didn't acquire the land. I was going to ask, do you think the district court should have made a determination as to how the land came to be acquired by the U.S.? I don't think so, only because it wasn't. I mean, they bear the burden of establishing jurisdiction, and so even if I think essentially what the district court said is even crediting their factual account of it, there's no jurisdiction as a matter of law, so I just think it wasn't necessary to resolve the factual dispute. I think there obviously is some forward-looking significance to whether the United States has exclusive federal jurisdiction over this land, but I don't think the court needed to resolve the factual dispute to make that determination. I recognize this isn't your burden to prove, and it's maybe not relevant to the case, but I'm curious, does the federal government have enclave jurisdiction over any other parts of the Coronado Naval Amphibious Base? So there is a very—if you look at the surveyor's declaration in the record, there's a very, very tiny piece of the base that was— that used to belong to the Department of the Army and then was eventually transferred to the Navy. I mean, it's really like a tiny fraction of the base, and the surveyor's view as articulated in the declaration here is that there is exclusive federal jurisdiction over that tiny strip of land. Nobody here thinks that this housing unit falls on that piece of land. And do you know how it obtained federal enclave jurisdiction over that part of the base that, you know, doesn't include the Saipan Parcel, I guess? Is that right? Yeah, I'm sorry. I don't know the history of that particular strip of land. There's obviously a lot of detailed history to all of this. I had a question about federal officer jurisdiction. Is it dispositive in the United States view that there is no evidence of communication between SDFH and the Navy about plaintiffs' particular complaints, or are there other factors that we need to look at under Lake? First, I want to be clear, as we say in our brief, our position on federal officer as well as federal agency jurisdiction is we take Lake as given. We're not here endorsing its analysis. But our position is just that there's no basis to distinguish Lake. I think Lake itself emphasizes the need for there to have been governmental direction of the conduct giving rise to liability. I don't know that it specifically requires communication. I mean, I think if you had, you know, something like the mold management plan, but instead of being like this one, it actually said, you know, you cannot conduct a mold inspection unless X, Y, and Z have happened. And they say, well, you know, we wanted to, but we couldn't do it. That was my next question. Yeah, so I don't know that you would have had to have had a specific communication about, you know, like about these particular people in their apartment if you had something like that. But, you know, there's nothing like that here. The mold management plan, like everything else they point to, is just sort of a way in which the government provides general direction and has supervisory and monitoring powers, which, you know, as the Rizzo Declaration explains, they do happen, but that's not, you know, directing defendants as to what they were supposed to do about this mold problem. Thank you. Thank you, Your Honors. Thank you. Your Honors, on the federal officer jurisdiction, and, like, that presented a completely different situation than this case. They only presented three pieces of very general evidence of Navy general oversight and control and then also pointed to a pesticide plan that Ohana admitted it didn't even follow. Here we present an absolute slew of evidence of significant Navy oversight and control over this housing, namely through the Rizzo Declaration, through the operating agreement, through the ground lease, through the O&M plan, which we did follow and we were required to follow, in which the Navy continues to monitor our following of, as we go forward, not just with the child's housing but other housing under San Diego family housing. This case is actually a lot more akin to Taylor Energy v. Luttrell, which is a Fifth Circuit case. It's not a removal case or a remand case. That was a derivative sovereign immunity case, but it presented a very similar factual situation where you had the contractor preparing a plan at the direction of the Coast Guard, which it then followed and executed. The plaintiff's claims in that case were that they should have done more than what the plan said. They should have gone beyond what the plan said, which is exactly what the child say in this case. We should have done more inspections. We should have done more testing. We shouldn't have continued to take Mr. Child's housing allowance. After they were relocated, we should have continued to pay for their hotel instead of offering them an alternative housing under the relocation policy of the Navy. The Fifth Circuit said not only does that entitle you to derivative sovereign immunity, not just does that meet a causal nexus, which is a far lower standard that's below this Court today, before this Court today. Thank you. Thank you very much, Ms. Reyna DeHart, Mr. Clark, Mr. Winnick. We appreciate the oral arguments presented here today. The case of Lena Childs v. San Diego Family Housing LLC, an in-depth corporation, is now submitted.
judges: MURGUIA, SANCHEZ, THOMAS